**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG DIVISION**

**HEATHER BARKER DAVIS,**

      **Plaintiff,**

**v.**                              **Civil Action No.: 3:12-CV-60**
                                         **JUDGE GROH**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

**REPORT AND RECOMMENDATION THAT CLAIMANT'S MOTION FOR**
**SUMMARY JUDGMENT BE DENIED**

**I.**    **INTRODUCTION**

On June 28, 2012, Plaintiff Heather Barker Davis ("Claimant"), by counsel Lori A. Gray, Esquire, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1). On September 10, 2012, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed his Answer and the administrative record of the proceedings. (Answer, ECF No. 10; Administrative Record, ECF No.11). On October 10, 2012 and November 7, 2012, Claimant and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 14; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 15).

Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.    BACKGROUND

*A.    Procedural History*

On October 24, 2007, Claimant filed a Title II application for Disability Insurance Benefits (hereinafter "DIB"), alleging disability that began on December 2, 2006 due to interstitial cystitis[1], chronic depression, migraines, insomnia and anxiety. (Tr. 101). The application was initially denied on February 1, 2008 and on reconsideration on April 18, 2008. (Tr. 51, 58). On May 12, 2008, Claimant filed a written request for a hearing (Tr. 64), which was held before United States Administrative Law Judge ("ALJ") Karl Alexander on June 3, 2009 in Morgantown, West Virginia. (Tr. 28). Claimant, represented by counsel, Lori A. Gray, Esq., appeared and testified, as did Eugene A. Czuczman, an impartial vocational expert. (Tr. 43).

On July 28, 2009, the ALJ issued an unfavorable decision to Claimant, finding that she was not disabled within the meaning of the Social Security Act. (Tr. 14). On January 5, 2010, the Appeals Council denied Claimant's request for review. (Tr. 452). On February 2, 2011, the United States District Court for the Northern District of West Virginia remanded this case for further proceedings and findings. (Tr. 455). On February 3, 2011, the Appeals Council vacated the final decision and remanded the case to an ALJ for further proceedings consistent with the Order of the District Court. (Tr. 513). The District Court did not reverse the ALJ's decision; rather, the issue

---

[1] Interstitial cystitis is a complex, chronic bladder disorder characterized by urinary frequency, urinary urgency, and pelvic pain. The symptoms of interstitial cystitis may vary in incidence, duration, and severity. The causes of interstitial cystitis are currently unknown, and treatments are directed towards relief of symptoms. 2002 WL 32063799, *1.

was sent on remand for the specific determination of the work-day limitations caused by Claimant's urinary frequency during the relevant time period, which is December 2006 through March 2007. (Tr. 456, 479).  It was ordered that more specific findings regarding the frequency and duration of Claimant's need for the bathroom during the relevant time period be included, after a second hearing.  (Tr. 457).  Subsequently, on June 15, 2011, a second hearing was held in Morgantown, West Virginia before ALJ Karl Alexander.  (Tr.402).  Claimant, represented by counsel, Lori A. Gray, Esq., appeared and testified, as did Dr. Larry G. Kontosh, an impartial vocational expert.  (Tr. 402).

On July 11, 2011, the ALJ issued an unfavorable decision to Claimant, finding she was not disabled within the meaning of the Social Security Act.  (Tr. 385).  On May 7, 2012 the Appeals Council declined to review the ALJ's decision.  (Tr. 374).

**B.      *Personal History***

Claimant was born on January 26, 1973, and was thirty-four (34) years old at the time she filed her first DIB claim.  (Tr. 94).  Under the regulations, Claimant was considered a "younger individual" and, generally, one whose age will not "seriously affect [Claimant's] ability to adjust to other work."  20 C.F.R. §§ 404.15639(c).  She received a high school diploma in 1991 and a degree in theology in 2001 from Liberty Baptist Bible Theological Seminary. (Tr. 32).  Claimant has prior work experience in retail sales, working at Walmart, Kmart, Sally Beauty Supply, Krispy Kreme Donuts and Hamricks Clothing Store.  (Tr. 33-36).  In addition, she worked in home health care, cooking, cleaning, and assisting in personal hygiene for her grandmother.[2]  (Tr. 36).  Claimant was married at the time she filed her initial claim and is now divorced.  (Tr. 196, 607).  Additionally,

―――――――――――――――――

[2] This was a paid position through Select-In-Home Services.  (Tr. 138).

she has one child, who was a dependent at the time of her claim but is now above the age of majority.  (Tr. 234).

### C.   *Medical History*

#### 1.   **Medical History: Background/Major Surgeries**

In 1998, Claimant was diagnosed with endometrial cancer, and had an abdominal hysterectomy with a bilateral oophorectomy.  (Tr. 234).

In December 2003, Claimant underwent gastric bypass surgery.  (Tr. 209).

#### 2.   **Medical History Pre-Dating Alleged Onset Date of December 2, 2006**

On March 1, 2006, Claimant was assessed by Stanley J. Kandzari, MD at University Health Associates in Morgantown, West Virginia, upon referral from Dr. Domingo T. Chua in Elkins, West Virginia, after he diagnosed Claimant with interstitial cystitis.  (Tr. 234).  Dr. Kandzari set up a plan, which was to include a cystoscopy, bladder biopsies, and bilateral retrograde pyelograms.  (Tr. 234).

Also on March 1, 2006, Claimant underwent an abdominal scan for renal calculi.  (Tr. 238). This scan revealed no large calcifications overlying Claimant's left kidney, and the right kidney could not be seen due to fecal material.  (Tr. 238).  Multiple small calcifications within the pelvis were found by the scan, and there was linear radiopaque density projecting within the right lower quadrant.  (Tr. 238).

On March 24, 2006, Claimant underwent a right retropyelogram cystogram, where approximately 10 radiographs were interpreted.  (Tr. 247).  The obtained images demonstrated multiple filling defects visualized within bilateral ureters, which are felt to represent air bubbles. (Tr. 237).

On April 12, 2006, Dr. Kandzari examined Claimant, as follow up from her cystoscopy.  (Tr.

233).  He noted her bladder biopsies were consistent with interstitial cystitis.  Claimant stated at the appointment that she has a "large amount of pain when she voids".  (Tr. 233).  Dr. Kandzari referred her for follow up with Stanley Zaslau, MD, also with University Health Associates in Morgantown, since interstitial cystitis is Dr. Zaslau's area of interest.  (Tr. 233).

On May 1, 2006, S. Shehzad Parviz, MD examined Claimant at Valley Health Care in Mill Creek, West Virginia.  (Tr. 215).  Claimant's chief complaint was needing anti-depression medication back, as she was "feel[ing] like she's ready to have a nervous breakdown".  (Tr. 215).  Dr. Parviz noted that Claimant never mentioned having depression during previous visits with Dr. Parviz; however, Claimant stated at the May 1, 2006 visit that she had "been depressed for seven years".  (Tr. 215).  Dr. Parviz's assessment was for depression and Dr. Parviz gave Claimant a starter kit of Effexor.  (Tr. 215).  She was advised about worsening depression and risk of suicide with the medicine.  (Tr. 215).  Claimant was to return in two weeks for follow up.  (Tr. 215).

On May 5, 2006, Claimant was examined by Dr. Zaslau upon referral from Dr. Kandzari.  (Tr. 232).  She reported voiding up to twenty times per day and twelve times at night, with no response from medication.  (Tr. 232).  Dr. Zaslau determined the InterStim implant to be the next course of action.  (Tr. 232).  The InterStim device is a permanently implanted pulse generator used to treat refractory urgency and frequency.  (Tr. 203).  Dr. Zaslau ordered the InterStim device to be implanted on a trial and permanent basis.  (Tr. 232).

On May 19, 2006, Claimant returned to Dr. Parviz at Valley Health Care in Mill Creek for follow up concerning her antidepressants.  (Tr. 213).  Claimant reported that her "depression has gotten better" but reported still having anxiety attacks.  (Tr. 213).  Claimant stated that she "feels she would benefit from a higher dose".  (Tr. 213).  Claimant reported having no suicidal thoughts

to plans. (Tr. 213). Dr. Parviz's assessment was for depression and anxiety that was improved, and Claimant's dosage of her antidepressant, Effexor, was increased. (Tr. 214). Claimant was advised to return in one month for follow up and to watch for signs of worsening depression or suicidal ideation. (Tr. 214).

On June 5, 2006, Claimant was examined by Dr. Zaslau at University Health Associates in Morgantown for follow up concerning the InterStim Stage I trial. (Tr. 231). Dr. Zaslau reported Claimant went from voiding about 25 times per day and 10 times at night to 10 times per day and up to 2 times at night. (Tr. 231). Claimant reported at this time being at least 75% better. Her dressing was clean and dry. (Tr. 231). Dr. Zaslau ordered a scheduling of the insertion of the Stage II (permanent) implant. (Tr. 231).

On August 9, 2006, Claimant again returned to Dr. Zaslau for follow up. (Tr. 230). Her symptoms were found to be dramatically improved, but there was "some leakage" from her wound, possibly due to an infection. (Tr. 230). Her wound remained closed. (Tr. 230). She was placed on antibiotics and an InterStim revision surgical procedure was planned. (Tr. 230). She was also placed on a pain contract protocol. (Tr. 230).

On August 28, 2006, Claimant was examined by Dr. Zaslau. (Tr. 229). He observed "dramatic improvement" in her symptoms as a result of the InterStim device, but observed purulent material emitting from the wound, causing a need for an InterStim revision. (Tr. 229). The next day, August 29, 2006, Claimant underwent surgery at West Virginia University Hospitals to revise the InterStim device. (Tr. 203). The surgeons, Dr. Zaslau and Rocco A. Morabito, MD, noted Claimant's symptoms had been markedly improved by the implantation of the InterStim device until she sustained a fall, resulting in reported numbness and the device no longer operating. (Tr. 203).

On September 12, 2006, Claimant returned to Dr. Parviz at Valley Health Care in Mill Creek. (Tr. 211). Claimant's chief complaint was for a medication refill and she reported her depression "has been stable". (Tr. 211). Dr Parviz' assessment was for depression and insomnia. (Tr. 212). Dr. Parviz refilled her medication and ordered Claimant to return in four to five months. (Tr. 212).

On September 25, 2006, Claimant was examined by Dr. Zaslau, where he noted she was "doing well with no complaints" after her InterStim revision. (Tr. 228). Claimant reported at this time to be "90% better". (Tr. 228).

On October 10, 2006, Claimant was examined by Dr. Parviz. (Tr. 209). Claimant's chief complaint was a headache that was "on and off for six weeks", and Claimant reported that she was in the Emergency Room two weeks prior. (Tr. 209). Dr. Parviz assessed her for migraine headaches. (Tr. 210).

On November 1, 2006, Claimant was seen at the Davis Memorial Hospital Emergency Room in Elkins for nausea, vomiting and abdominal pain. (Tr. 273). She was prescribed medication. (Tr. 274). Three days later, on November 4, 2006, Claimant again visited the Emergency Room, complaining of nausea, vomiting, diarrhea, and abdominal cramping. (Tr. 265).

On December 1, 2006, Claimant was examined by Dr. Zaslau. (Tr. 227). She reported being recently hospitalized with the flu and dehydration, and reported voiding 15-20 times per day and as many as three times per night. (Tr. 227). At this time, Dr. Zaslau reprogrammed her InterStim device using the N'Vision InterStim programmer. (Tr. 227). He checked all the impedances and adjusted her settings. (Tr. 227).

### 3. Medical History Post-Dating Alleged Onset Date of December 2, 2006

On January 23, 2007, Claimant was seen at Davis Memorial Hospital Emergency Room

in Elkins, complaining of a migraine.  (Tr. 260).

On February 5, 2007, Claimant was examined by Dr. Zaslau in Morgantown, where he prescribed her pain medication in accordance with her pain contract protocol.  (Tr. 226).

On February 23, 2007, Claimant was again seen at the Davis Memorial Hospital Emergency Room in Elkins.  (Tr. 257).  Claimant complained of a migraine "for four days".  (Tr. 257).  On February 27, 2007, Claimant was seen at the Belington Clinic in Belington, West Virginia for a follow up to her February 23, 2007 Emergency Room presentment.  (Tr. 242). There, the health care provider diagnosed her with uncontrolled migraines and referred her to a neurologist.  (Tr. 242).

On March 12, 2007, Claimant was examined by Dr. Zaslau.  (Tr. 225).  He assessed her InterStim device and recorded that she was voiding about 10 times per day and four times at night, which was still 50% better than her original symptoms.  (Tr. 225).

On April 4, 2007, Claimant entered the Emergency Room at Davis Memorial Hospital in Elkins, complaining of nausea and vomiting, light sensitivity, and symptoms similar to her previous migraines.  (Tr. 252-253).  She reported having a migraine for five days.  (Tr. 252). Also on April 4, 2007, Claimant followed up at Belington Clinic, where she was diagnosed with an acute migraine and improved chronic headaches.  (Tr. 241).  She reported not seeing a neurologist, whom she was referred to on her February 27, 2007 visit to the Belington Clinic, because of financial reasons.  (Tr. 241).

From April to June 2007, Claimant was examined monthly by Dr. Zaslau.  (Tr. 222-224). On April 11, 2007, Dr. Zaslau, reported Claimant was voiding about 10-12 times per day and four times at night, which was at least 50% better than her original symptoms.  (Tr. 224).  On

May 9, 2007, Claimant reported voiding about 8-10 times per day and a few times at night. (Tr. 223). Dr. Zaslau noted Claimant was 50% better overall. (Tr. 223). On June 1, 2007, Dr. Zaslau, noted Claimant's symptoms were "well controlled" and that she was "doing well". (Tr. 222). Her implant site was clean, dry, and intact. (Tr. 222). Instead of monthly follow ups, Dr. Zaslau noted in her plan that he would see her back in a few months, or sooner if she was having difficulties, per her pain protocol. (Tr. 222).

On July 24, 2007, Claimant was seen in the Belington Clinic for her three-month follow up, where she also stated she wanted to discuss antidepressants with the health care provider. (Tr. 240). She complained of a migraine headache that was four days in duration. (Tr. 240). Claimant was diagnosed with depression with poor control and migraine headaches and given medication for each. (Tr. 240). At this appointment, her mood was described as "depressed" and her affect was described as "subdued". (Tr. 240).

On September 10, 2007, Claimant was examined by Dr. Zaslau, where he noted again that her symptoms were well-controlled and she was doing well. (Tr. 221). He recorded that she "returns for pain medications". (Tr. 221). He prescribed her pain medication, noting that he was giving her two additional refills because she has done well with her compliance and has been very respectful of the importance of the contract. (Tr. 221). He noted that she was due back in three months. (Tr. 221).

On October 22, 2007, Claimant was seen in the Belington Clinic for a routine check on her depression and migraine headache diagnoses. (Tr. 239). She was observed as having "good control" on her depression and "fair control" on her anxiety. (Tr. 239). Her mood was described as "somewhat depressed". (Tr. 239). Her diagnoses were listed as depression and anxiety,

noting "all other [was] stable". (Tr. 239). She was ordered to follow up in four months. (Tr. 239).

On October 26, 2007, Claimant was seen at the Davis Memorial Hospital Emergency Room in Elkins. (Tr. 244). Claimant complained of headaches, nausea, and vomiting. (Tr. 244). At that time, a computed tomography (CT) scan was performed on Claimant's brain and interpreted by Thomas Koay, MD. (Tr. 248). Results were normal. (Tr. 248).

On December 10, 2007, Claimant was evaluated by Dr. Zaslau, as part of follow up for refractory urgency, frequency and interstitial cystitis with the InterStim Stage II implant in place. (Tr. 352). Dr. Zaslau recorded that Claimant's symptoms were well controlled. (Tr. 352). At this time, Claimant had no complaints in terms of pain medication per her contract. (Tr. 352). She was to return in three months. (Tr. 352).

On January 21, 2008, Claimant's mental health was assessed by Thomas C. Stein, Ed.D. (Tr. 278). Claimant had a cooperative, polite and subdued manner, providing verbal responses that were adequate in length and depth. (Tr. 280). Claimant had orientation as to time/place/person, a mostly subdued affect, mildly deficient immediate memory, moderately deficient remote memory, and poor concentration. (Tr. 280-81). Claimant's chief complaints were of depression, anxiety, interstitial cystitis symptoms, interstitial cystitis pain medication causing her to be "groggy and uncoordinated", suicidal thoughts and migraines. (Tr. 279). Additionally, Claimant's presenting symptoms were sleep disturbances, poor energy level, panic attacks occurring "at least once a day", compulsive checking of her front door being locked and "compulsive cleaning of [her] toilet several times a day". (Tr. 279). Claimant was diagnosed with Post Traumatic Stress Disorder (hereinafter "PTSD"), Panic Disorder with Agoraphobia

and Major Depressive Disorder.  (Tr. 281).

From March 2008 to February 2009, Claimant was seen by Dr. Zaslau monthly (with the exception of July and December) concerning her pain contract protocol for interstitial cystitis. (Tr. 342-351).  On May 5, 2008, Dr. Zaslau stated Claimant's refractory urgency and frequency were "stable".  (Tr. 349).  On January 5, 2009, Claimant had "no new issues going on right now and [was] currently satisfied with her urologic condition."  (Tr. 343).

On March 21, 2008, Claimant was evaluated by Jeffrey G. Harris, DO for depression and migraine headaches.  (Tr. 326).  At this time, Dr. Harris started Cymbalta as part of Claimant's medication regimen.  (Tr. 326).

On August 20, 2008, Claimant was seen by Kurstie Hendon, MA at the Appalachian Community Health Center in Elkins, after Claimant referred herself for suicidal ideations.  (Tr. 335).  Claimant stated she had a plan to overdose on her pain medication.  (Tr. 336).  Claimant's affect was "broad" and she "had an agitated and sad mood".  (Tr. 336).  Her short term memory was "poor"; however, her long term memory was "intact".  (Tr. 336).  She was well oriented. (Tr. 336).  Claimant reported depression that intensified three years prior.  (Tr. 335).  She reported always being in pain, being "agitated and annoyed" by her depression, and experiencing panic attacks upon leaving her house because of her health problems.  (Tr. 335).  Ms. Hendon opined that Claimant may benefit from individual therapy for physical health problems.  (Tr. 336).  Claimant's provisional diagnostic impression was Major Depressive Disorder – Recurrent, Moderate, Generalized Anxiety Disorder and Adjustment Problems.  (Tr. 337).

On January 26, 2009, Claimant underwent a comprehensive psychiatric diagnostic interview and examination by psychiatrist Greenbrier Almond, MD at the Appalachian

Community Health Center in Elkins. (Tr. 330). Claimant reported that she voided sixty times per day, which interfered with her sleep at night. (Tr. 330). Dr. Almond noted that Claimant was able to sit through the hour-long interview without going to the restroom, although she was told she could be excused at any time. (Tr. 331). Claimant reported that taking Cymbalta caused her previous suicidal ideations, and since she was taken off of that medication she has no longer had suicidal thoughts. (Tr. 330-331). Claimant's intellectual and sensorial function appeared to be "grossly within normal limits". (Tr. 332). Dr. Almond's formulation was Claimant suffers with Mood Disorder secondary to her chronic illness. (Tr. 333). Claimant was put on a combination of medication and ordered to keep her therapy appointments. (Tr. 334). It was determined that the Appalachian Health Center and her doctor at the Belington Clinic would work together. (Tr. 331). Claimant returned monthly to the Appalachian Community Health Center for pharmacological management in February and March 2009. (Tr. 327-328). On March 24, 2009, Claimant reported "feel[ing] better in general", yet having "some difficulty with initial/middle insomnia". (Tr. 327). She was noted as not presenting as "depressed, angry, irritable, or anxious" and her affect "was appropriate". (Tr. 327).

### D.   *Testimonial Evidence*

#### 1.   *June 3, 2009 ALJ Hearing*

Testimony was taken at the hearing held on June 3, 2009. The following portions of the testimony are relevant to the disposition of the case:

Claimant testified she previously worked in retail sales, starting from the time she was sixteen years old. (Tr. 33). Claimant testified through the years, she held various positions in retail at Walmart, Kmart, Sally Beauty Supply, Krispy Kreme Donuts, and Hamricks Clothing Store. (Tr.

33-35). In her positions at Walmart and Kmart, Claimant testified she lifted items regularly, such as bags of dog food and bags of mulch. (Tr. 33). Claimant testified she stocked shelves at Sally Beauty Supply. (Tr. 34). Claimant testified she restocked the front end and boxed doughnuts at Krispy Kreme. (Tr. 34). Claimant testified she returned to Walmart, performing work at service desk processing warranty claims, which required her to be on her feet for eight hours per day. (Tr. 35). At Hamricks Clothing Store, she performed the unloading of the children's department merchandise as it came in. (Tr. 35). Claimant testified in this position, she was also on her feet for eight hours per day. (Tr. 35). Claimant also testified she worked in the home health industry, as a health care provider for her grandmother.[3] (Tr. 36). Claimant testified this work involved assisting with personal hygiene, cleaning, cooking, lifting her and moving her. (Tr. 36). Claimant testified she has not been employed since December 2006. (Tr. 36).

Claimant described her most serious problem as "the fact that [she] go[es] to the bathroom all the time" because of interstitial cystitis. (Tr. 36). Claimant testified on a bad day, she must use the restroom between fifteen and twenty times per hour, and that she experiences bad days fifteen or twenty days per month. (Tr. 42). Claimant testified on a typical day, she must use the restroom between four and five times per hour. (Tr. 48). Claimant testified her next most disabling condition is anxiety and depression. (Tr. 27). Claimant testified she experiences panic attacks twice per day, or even more "if there's something going on that [she] know[s] [she's] got to be". (Tr. 37-38). Claimant testified depression causes her symptoms of "really blue moods" and "being down in the dumps". (Tr. 38). Claimant testified she experiences constant pelvic pain, as a result of interstitial cystitis. (Tr. 39). Claimant testified she takes Prozac for depression and anxiety, Deplin (a vitamin

_____

[3] This was a paid position through Select In-Home Services. (Tr. 138).

for depression), Neurontin and Percocet. (Tr. 39). Claimant testified she experiences side effects from these medications: sleepiness from Neurontin and dizziness and sleepiness from Percoet. (Tr. 40). Claimant stated for this reason, she does not drive. (Tr. 40). Claimant testified she also experiences side effects as a result of her InterStim device implant, primarily electrical interference and being unable to sit for a long time. (Tr. 40).

Regarding her daily activities, Claimant testified she does not cook. (Tr. 40). Claimant testified she "may fold a load of laundry, but that's very rare". (Tr. 40). Claimant testified she is unable to read a newspaper article because she gets frustrated and loses her place. (Tr. 42). Claimant testified she no longer drives her daughter to extracurricular activities, buys groceries or goes to church. (Tr. 42).

The ALJ then solicited testimony from the Vocational Expert ("VE"), Eugene A. Czuczman. (Tr. 43). The VE characterized Claimant's previous work as follows: work as a home health care aide is a medium exertional level and semi-skilled; work as a retail clerk is a light exertional level and semi-skilled; work as a store laborer is a medium exertional level and is semi-skilled; work as a store manager is a light exertional level and is skilled (although in Claimant's case is a medium exertional level because she was still performing store laborer duties while a store manager); work as a department manager is a medium exertional level and is skilled; work as a customer service clerk is a light exertional level and semi-skilled (although for Claimant it is a medium exertional level because she was still performing store laborer and other duties while a customer service clerk). (Tr. 44-45). The VE then testified there were significant jobs in the regional and national economy at the light level with the sit/stand option that existed. (Tr. 46).

**b. June 15, 2011 ALJ Hearing**

Testimony was taken at Claimant's second ALJ hearing held on June 15, 2011. (Tr. 402). The second ALJ hearing was held after the matter was remanded from the district court solely "for a determination of the work-day limitations caused by [Claimant's] urinary frequency during relevant time period". (Tr. 456). The following portions of the testimony are relevant to the disposition of the case:

Claimant testified at the hearing during 2006 and prior through 2007, she suffered from interstitial cystitis, depression, anxiety, migraines, and insomnia. (Tr. 406-407). Claimant testified she believed Dr. Zaslou's treatment notes from 2006 and 2007 which stated how many times she was voiding per day, to be correct. (Tr. 410-411). Claimant testified all the symptoms she had during her January 21, 2008 diagnoses of PTSD, Panic Disorder with Agoraphobia and Major Depressive Disorder all existed during 2006 as well. (Tr. 413). Claimant testified during Spring 2011, she started keeping track of the number of times per day she voided using a calendar. (Tr. 413). This record was not introduced into evidence nor brought to the ALJ hearing. (Tr. 413, 420). Claimant testified averages of 38 to 50 times per day were typical and consistent for the time period of the current year, 2011. (Tr. 414). Claimant opined that these times are more per day than they were in 2006. (Tr. 415). Claimant testified in 2006 through 2011, she experienced extreme pain when she voided. (Tr. 416). Claimant testified she could not remember the exact times she voided back to 2006, and was going primarily off of what she told Dr. Zaslau at the time. (Tr. 419-420).

The ALJ then solicited testimony from the VE, Larry Kontosh. (Tr. 420). The ALJ stated past relevant work information was covered in the last hearing and would be repetitious. (Tr. 420). The VE instead, at the direction of the ALJ, focused on any jobs that would accommodate a person

that would be able to perform a range of light work, would require the sit/stand option, could perform postural movements occasionally except that could not climb ladders, ropes, or scaffolds, should not be exposed to temperature extremes, weather, humid conditions or hazards, should work in a low-stress environment with no production line or assembly line type of pace and no independent decision-making responsibilities, would be limited to unskilled work involving only routine and repetitive instructions and tasks, should have no interaction with the general public and no more than occasional interaction with coworkers and supervisors, would be accommodated by being placed close to a bathroom facility and would need to make up to five bathroom trips in an eight hour work day, each lasting five to eight minutes in the regional or national economy. (Tr. 420-421). The VE testified there were significant jobs in the regional and national economy that existed. (Tr. 421). Upon cross examination, the VE testified that anyone who requires breaks over ten percent of the day would be precluded from competitive employment, as it exceeds customary tolerances of off-task behavior. (Tr. 423, 426).

F.      *Lifestyle Evidence*

On an adult function report dated November 17, 2007, Claimant reported she lives at home with her family and spends a typical day eating breakfast, taking her medications, sitting in her chair, laying down, eating lunch, taking more medications, laying back down, eating supper, watching TV, taking more medications, and getting ready for bed. (Tr. 145). All through the day, Claimant reported she visits the restroom four to six times per hour. (Tr. 145). Claimant reported that she goes outside once or twice per week, either by driving or riding in a car. (Tr. 147). However, Claimant reported she cannot go out alone, because her medications cause her to become "dizzy and groggy". (Tr. 147). Claimant reported she shops for personal care items, clothes and food one to

two times per month.  (Tr. 147).  Claimant reports it takes her "several hours" to shop, and she uses a motorized cart.  (Tr. 147).   Claimant reported she is able to pay bills, handle a savings account, count change, and use a checkbook and money orders, although her ability to handle money has changed since her illness and she now makes careless mistakes and loses receipts.  (Tr. 147, 149). Claimant reported she prepares her own meals about once per week, which consist of peanut butter sandwiches and frozen dinners.  (Tr. 148).  Claimant reported she does household chores in the form of folding clothes which are brought to her and then put away by others.  (Tr. 148).

Claimant stated she enjoys scrapbooking, knitting, reading, watching TV, and crocheting; however, she can only perform those hobbies one to two times per month.  (Tr. 149).  Claimant stated she cannot "do them as well" or sit for a long period of time.  (Tr. 149).  Claimant spends time with others using the phone and email, as well as by attending church.  (Tr. 149).  Claimant reported she uses email four to five times per week.  (Tr. 149).

### III.    CONTENTIONS OF THE PARTIES

Claimant, in her motion for summary judgment, asserts that the Commissioner's decision "is based upon an error of law and is not supported by substantial evidence."  (Pl.'s Mot. at 1.) Specifically, Claimant alleges that:

•       The ALJ erred as a matter of law by discounting Claimant's credibility without providing specific reasons supported by evidence in the case record;

•       The ALJ erred as a matter of law by finding Claimant is capable of work that exists in substantial numbers in the national economy by not considering how Claimant's urinary frequency and duration impacted her ability to work; and

•       The ALJ failed to give appropriate weight to the interstitial cystitis diagnosis.

(Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem." at 2, ECF No. 14-1).  Claimant asks the

Court to "remand the case to the Commissioner with instructions to issue a new decision based on

substantial evidence and proper legal standards."  (Id. at 10).

Defendant, in his motion for summary judgment, asserts that the decision is "supported by

substantial evidence and should be affirmed as a matter of law."  (Def.'s Mot. at 1).  Specifically,

Defendant alleges that:

- Substantial evidence supports the ALJ's determination that Claimant was less than fully credible;

- The ALJ properly considered the frequency and duration of Claimant's bathroom breaks; and

- The ALJ properly evaluated Claimant's interstitial cystitis diagnosis.

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 9-14).

## IV.   STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the

following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied.  *See* 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . .");  Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . .  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence.  See Laws v.

Celebrezze, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962).

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Laws, 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability determinations."  Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976).  Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V.  DISCUSSION

### A.  *Standard for Disability and the Five-Step Evaluation Process*

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . .  "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

See 42 U.S.C. § 423(d)(2)(A) (2006).  The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s).  If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ."
20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§  404.1520; 416.920 (2011).  If the claimant is determined to be disabled or not

disabled at any of the five steps, the process does not proceed to the next step.  Id.

**B.**    ***Discussion of the Administrative Law Judge's Decision***

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

1.    **The claimant last met the insured status requirements of the Social Security Act on March 31, 2007.**

2.    **The claimant did not engage in substantial gainful activity during the period from her alleged onset date of December 2, 2006 through her date of last insured of March 31, 2007 (20 CFR 404.1571 *et seq.*).**

3.    **From December 2, 2006 through the date of last insured of March 31, 2007, the claimant had the following medically determinable impairments that, either individually or in combination, were "severe" and**

significantly limited her ability to perform basic work activities: interstitial cystitis; migraine headaches; manic depressive disorder; anxiety disorder; and Post-Traumatic Stress Disorder (PTSD) (20 CFR 404.1520(c)).

4.    Through the date of last insured, the claimant did not have an impairment or combination of impairments that met or medically equalled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 4041525 and 404.1526).

5.    From December 2, 2006 through March 31, 2007, date last insured, the claimant has had only the residual functional capacity to perform, within a low stress environment, a range of unskilled work activity that: requires no more than a "light" level of physical exertion; affords the option to sit or stand; allows performance of postural movements only occasionally, but no climbing of ladders, ropes, or scaffolds; entails no exposure to temperature extremes, wet/humid conditions, or hazards; entails no production line type of pace or independent decision making responsibilities; involves only routine, repetitive instructions and tasks; requires no interaction with the general public and no more than occasional interaction with supervisors and coworkers; can accommodate the employee by placing her close to the bathroom; and can accommodate up to five bathroom trips in an eight-hour day, each lasting five to eight minutes in duration.

6.    Through the date of last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on January 26, 1973 and was 34 years old, which is defined as a younger individual, on the day of last insured (20 CRF 404.1564).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in signifcant numbers in the national economy that the claimant

**could have performed (20 CFR 404.1569 and 404.1569(a)).**

(Tr. 390-395).

**C.    *Analysis of the Administrative Law Judge's Decision***

**1.  The ALJ Properly Determined Claimant Was Not Fully Credible**

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. Id. at 594. The ALJ must next "expressly consider" whether a claimant has such an impairment." Id. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled. Id. at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. Id.

The regulations set forth certain factors for the adjudicator to consider to determine the extent to which the symptoms limit the claimant's capacity to work:

> 1) The individual's daily activities; 2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) Factors that precipitate and aggravate the symptoms; 4) Type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and 7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. 404.1529(c) and 416.929(c).

Accompanying factors are provided in SSR 96-7p that the adjudicator must also consider in addition to the objective medical evidence when assessing the credibility of an individual's statements. These factors include medical signs and laboratory findings; diagnosis, prognosis, and other medical opinions provided by medical sources; and statements and reports about claimant's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the claimant's symptoms and how the symptoms affect the individual's ability to work. SSR 96-7p.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

Claimant's argument regarding the ALJ's credibility determination must fail. Claimant argues the "ALJ stated that his reasons [sic] for questioning [Claimant's] credibility was her testimony as to the number of times she has to go to the bathroom" and that the ALJ "further attacks her credibility by stating [Claimant] merely confirming reports she previously made to her treating physicians is far less persuasive than the claimant [sic] actually being able to recall her symptoms on her own." See Pl.'s Mot., Pg. 7-8 (ECF No. 14-1). Furthermore, Claimant urges

the ALJ "was critical of [Claimant] in that she was not reporting at the hearing her urinary frequency from memory." Id. However, the ALJ took careful consideration of all the longitudinal evidence regarding her past reports of urinary frequency and number of times per day she voided to health care providers at the time (because the statements had been a few years prior by the time her second hearing occurred), the reports she gave in her Social Security reports and forms and the objective medical evidence in evaluating her credibility and veracity of her allegations. See ALJ Decision, Transcript Pg. 391. The ALJ's 2009 decision, as well as the record, illustrate that the ALJ evaluated Claimant's symptoms in accordance with the two-part test in Craig and the SSR 96-7p factors. Under Craig, the ALJ first found that "Claimant's medically determinable impairments could reasonably expected to cause some of the alleged symptoms." See ALJ Decision, Transcript Pg. 22. The ALJ, however, did not find Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms to be "credible to the extent they are inconsistent with the...residual functional capacity assessment." Id. In his 2011 decision, the ALJ revisited the credibility consideration for the second part of the two-part test, focusing on the frequency and duration of Claimant's restroom usage during the relevant time period. See ALJ Decision, Transcript Pg. 392. In addition to the residual functional capacity assessment, the ALJ found indicia of unreliability in other evidence.

Contrary to Claimant's assertion that the ALJ did not provide specific rationale to support his decision, the ALJ devoted three pages of his decision to his credibility analysis with regard to Claimant's urinary frequency and duration. Id. at 391-394. He discussed the fact that the District Court declined to overturn his original credibility finding, ruling that substantial evidence supported his conclusion in that area. Id. at 392. He outlined examples of precise instances

Claimant's reports of numbers of restroom visits per day were vastly different from numbers she reported on dates directly after. Id. at 393. For instance, the ALJ provided an example from the longitudinal record where Claimant reported to her doctor in December of 2007 that her symptoms were well controlled, but then one month later, she reported to the consultive examiner that she used the bathroom 8 to 10 times per hour on bad days, which equals out to 128 to 160 times in a 16 hour period. Id.

Also, the ALJ cited examples of instances the numbers she reported to health care providers were decreasing, only to have a vastly higher number reported immediately after that as part of her Social Security paperwork. For instance, the ALJ outlined an instance where throughout late 2006 and 2007, she reported having to void 15 to 20 times per day (notably after a case of flu with dehydration), then reporting a decreased number of eight to ten times per day, indicating she was doing well, indicating her symptoms were well controlled, followed by a Disability Report two months later in which she self-reported needing to use the bathroom six or more times per hour. Id. Also, in her self-report in her function report, which was filled out at the same time, Claimant listed urinary frequency of four to six times per hour throughout the day, which equals out to 64 to 96 times in a 16-hour period. Id. Additionally, in the previous example, the higher number was reported to the Social Security Administration's appointed consultative examiner, shortly after she told her treating physician her urinary symptoms were well-controlled. The ALJ noted the District Court also pointed out at that these reports were "entirely inconsistent with [Claimant's] own reports to her own treating physician." Id. The ALJ noted that there was "no new evidence relating to the period at issue", and rather, evidence was instead confirming the subjective self-reports that were previously made to the treating

physicians.  Id.  Contrary to Claimant's assertion, the undersigned does not view this as an attack on Claimant's credibility or an instance of the ALJ "being critical of [Claimant] in that she was not reporting at the hearing her urinary frequency from memory."  See Pl.'s Mot., Pg. 8 (ECF No. 14-1).  Instead, the ALJ points out that this type of evidence did nothing to clear up the "glaring inconsistences" that were at issue at the first hearing and that there was still an overall extreme inconsistency in Claimant's reporting of frequency and duration of urination.  See ALJ Decision, Transcript Pg. 393.

Moreover, the ALJ did take into account "one of the more consistent figures espoused" by Claimant, which he found to be "reasonable in light of the medical evidence as a whole" and accordingly, concluded that Claimant's urinary frequency caused her to require an additional bathroom break for every 1.5 hours worked. Id. at 394.  He included this in his fifth finding.  Id. at 391.  Therefore, the undersigned concludes substantial evidence supports the ALJ's thorough analysis on the credibility issue, as well as his ultimate conclusion.

### 2. The ALJ Properly Analyzed And Assessed Claimant's Frequency And Duration Of Urination

Claimant argues the ALJ did not "make findings 'concerning the frequency and duration of the claimant's necessary restroom usage...to determine whether... [she] would have been able to work at a job(s) available in significant numbers in the national economy at that time'" and thus "failed to comply with the directions given to him upon remand by Magistrate Kuall [sic]." See Pl.'s Mot., Pg. 9 (ECF No. 14-1).  As described in the previous section, the ALJ fully and thoroughly analyzed the issue of Claimant's urinary frequency and duration looking at the entirety of the longitudinal record as a basis.  Plaintiff argues the ALJ failed to carry out the orders of the District Court on remand by focusing on urinary frequency and failing to address the

issue of urinary duration.  Id. at 10.

Claimant's argument must fail.  In his thorough analysis of Claimant's urinary history in his credibility determination, the ALJ specifically analyzed Claimant's urinary duration when he concluded that she required an additional bathroom break.  See ALJ Decision, Transcript Pg. 394. Like he compared Claimant's self-reporting of urinary frequency to the medical evidence, the ALJ compared the reports of Claimant's urinary duration to the objective medical evidence.  He concluded that her report of having to spend an average of five minutes per visit has remained constant since 2006.  Id.  The ALJ looked at the urinary duration evidence from the entire longitudinal record.  From this, he concluded that Claimant's urinary duration of her bathroom visits as a result of interstitial cystitis requires additional bathroom breaks to be allotted to Claimant.  Id.  Further, the ALJ afforded Claimant "significant benefit of the doubt" in allotting her bathroom breaks between five and eight minutes in duration, to account for "the occasional bathroom visit that may take longer than five minutes."   Id.

The undersigned finds the ALJ discussed his analysis of Claimant's urinary duration, the ALJ considered the logitudnal record as a whole, as well as increased her bathroom breaks accounting for her urinary duration reporting, and finds substantial evidence supported his conclusions regarding Claimant's urinary frequency and duration.

### 3.      The ALJ Gave Appropriate Weight to Claimant's Interstitial Cystitis Diagnosis

Claimant argues the ALJ erred in not deeming her interstitial cystitis diagnosis a disability "in and of itself".  See  Pl.'s Br. at 13.  Social Security Ruling 02-2p explains that the Adminsitration's policy is to expressly recognize interstitial cystitis is a diagnosis of exclusion because there is currently no definitive test to identify the disorder.  Roush v. Barnhart, 326 F.

Supp. 2d 858, 869 (S.D. Ohio 2004) <u>citing</u> SSR 02-2p, TITLES II AND XVI: EVALUATION OF INTERSTITIAL CYSTITIS (November 5, 2002).  The Ruling is not binding authority, but constitutes persuasive authority from which the Court can derive the current trend in the Administration's evaluation of claims based on interstitial cystitis.  <u>Id</u>.

SSR 02-2p states that interstitial cystitis is a complex, chronic bladder disorder, that when accompanied by appropriate symptoms, signs and laboratory findings, is a medically determinable impairment that can be the basis for finding a disability.  2002 WL 32063799, *1.  It does not say that the existence of a diagnosis is per se a disability under the Act.  After the ALJ determines a Claimant has a diagnosis of interstitial cystitis, the ALJ must then determine, in accordance with the five-step sequential evaluation process, whether the impairment prevents the claimant from doing past relevant work or other work existing in substantial numbers in the national economy.  <u>Id</u>.

<u>Barnhart</u> involved a Claimant with an interstitial cystitis diagnosis.  The Court affirmed the ALJ's decision that in spite of this diagnosis, Claimant was not disabled under the Act because there was no objective evidence supporting the Claimant's claim that she must urinate every twenty minutes.  326 F. Supp. 2d at 867-868.  Instead, the only measure of the Claimant's urinary frequency was established by a physician's notes that only repeated the Claimant's subjective complaints.  <u>Id</u>.

In this case, the ALJ also found the Claimant was not disabled despite an uncontested interstitial cystitis diagnosis.  Following the two-step process, after the ALJ evaluated Claimant's interstitial cystitis and whether that disorder causes Claimant to have a disability under the Act, he assessed Claimant's ability to do work existing in substantial numbers in the regional and

national economy, based upon the testimony of the VE.  See ALJ Decision, Transcript Pg. 22.

The VE testified, when specifically asked whether jobs exist within the national economy for an

individual within Claimant's age category, with the same level of education, work experience,

and residual functional capacity as had been proscribed, that given all of those factors, such an

individual would be able to perform the requirements of "light" exertional jobs available in

numbers ranging from at least 100 to 900 statewide and 60,000 to 80,000 nationally.  Id. at 25.

The ALJ additionally noted that this testimony from the VE is consistent with the information

contained in the Dictionary of Occupational Titles.  (Tr. 25).

Contrary to Claimant's assertion, this Court rejects the argument that this Ruling

establishes that interstitial cystitis is a disability in and of itself.  The Court finds the ALJ properly

considered Claimant's interstitial cystitis diagnosis and the numbers of light exertional jobs that

exist in the national economy for an individual within Claimant's age category, with the same

level of education, work experience, and residual functional capacity to Claimant and, therefore,

substantial evidence supports the ALJ's determination.

## VI.   RECOMMENDATION

For the reasons herein stated, the undersigned Magistrate Judge finds that the Commissioner's

decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental

Security Income is supported by substantial evidence.  Accordingly, the undersigned

**RECOMMENDS** that Plaintiff's Motion for Summary Judgment (ECF No. 1) be **DENIED**,

Defendant's Motion for Summary Judgment (ECF No.15) be **GRANTED**, and the decision of the

Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable JUDGE GINA M. GROH, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Respectfully submitted this 3rd day of December, 2012.

_____
DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE